**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **NEAL HARRIS,** | : | **CASE NO.  3:19-cv-00341** |
| **6707 Little Twin Road** | : | |
| **Germantown, Ohio 45327** | : | **Judge** |
| | : | |
| **-and-** | : | |
| | : | |
| **JOY HARRIS,** | : | |
| **6707 Little Twin Road** | : | |
| **Germantown, Ohio 45327** | : | |
| | : | |
|             **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GERMAN TOWNSHIP, OHIO** | : | |
| **12102 State Route 725 West** | : | |
| **Germantown, Ohio 45327** | : | |
| | : | |
| **-and-** | : | |
| | : | |
| **GERMAN TOWNSHIP BOARD OF** | : | |
| **TRUSTEES** | : | |
| **12102 State Route 725 West** | : | |
| **Germantown, Ohio 45327** | : | |
| | : | |
| **-and-** | : | |
| | : | |
| **BENJAMIN F. DEGROAT** | : | |
| **13651 Friend Road** | : | |
| **Germantown, OH 45327** | : | |
| *Individually and in his Official Capacity as a* | : | |
| *Member of the German Township Board of* | : | |
| *Trustees* | : | |
| | : | |
| **-and-** | : | |
| | : | |
| | : | |
| | : | |

**JACOB C. STUBBS**                        :
**c/o German Township**                    :
**12102 State Route 725 West**             :
**Germantown, Ohio 45327**                 :
*Individually and in his Official Capacity as a* :
*Member of the German Township Board of*   :
*Trustees*                                 :
                                           :
**-and-**                                  :
                                           :
**MARK D. CROSS**                          :
**c/o German Township**                    :
**12102 State Route 725 West**             :
**Germantown, Ohio 45327**                 :
*Individually and in his Official Capacity as a* :
*Member of the German Township Board of*   :
*Trustees*                                 :
                                           :
**-and-**                                  :
                                           :
**CHERYL WATSON**                          :
**8777 Oak Drive**                         :
**Germantown, OH 45327**                   :
*Individually and in her Official Capacity as* :
*an employee of German Township*           :
                                           :
**-and-**                                  :
                                           :
**VALORIE A. HILL**                        :
**c/o German Township**                    :
**12102 State Route 725 West**             :
**Germantown, Ohio 45327**                 :
*Individually and in her Official Capacity as* :
*an employee of German Township*           :
                                           :
    **Defendants.**    :

---

## COMPLAINT
## (JURY DEMAND ENDORSED HEREON)

---

2

3264865.6

Plaintiffs Neal and Joy Harris set forth the following claims against Defendants German Township, Ohio, German Township Board of Trustees, Benjamin DeGroat, Jacob C. Stubbs, Mark D. Cross, Cheryl Watson, and Valorie A. Hill:

## NATURE OF THE ACTION

1. Plaintiffs Neal and Joy Harris bring this action against the Defendants to recover for the blatant and gross violation of their civil rights and other violations of law caused by Defendants' egregious conduct. Both individually and in concert, Defendants engaged in a pattern of illegal conduct purposefully designed to violate the protections guaranteed to Plaintiffs under both the United States and Ohio Constitutions and otherwise intimidate Plaintiffs into foregoing the lawful and permitted use and enjoyment of their property.

## PARTIES

2. Plaintiffs Neal and Joy Harris (collectively referred to as the "Harrises") are husband and wife residing at 6707 Little Twin Road, Germantown, Ohio 45327.

3. Defendant German Township ("Township") is a political subdivision organized under the laws of the State of Ohio and existing within the jurisdictional boundaries of Montgomery County, Ohio. Pursuant to Title V of the Ohio Revised Code, the Township may be sued. The business of the Township is conducted by the German Township Board of Trustees. The Township is a "person" under 42 U.S.C. §1983 and at times relevant to this action acted under color of law.

4. Defendant German Township Board of Trustees (the "Board") is the governing and administrative body of German Township, Ohio, acting pursuant to O.R.C. §503.01 and having the authority to be sued in its corporate name. The Board is responsible for legislative,

3

policy and administrative actions on behalf of the Township. The Board is a "person" under 42 U.S.C. §1983 and at times relevant to this action acted under color of law.

5.     Defendant Benjamin F. DeGroat ("DeGroat") is an Ohio resident currently residing at 13651 Friend Drive, Germantown, Ohio. DeGroat was, at all times relevant hereto, a member of the Board acting under color of law. He is sued in both his individual capacity and his official capacity as a policymaker for the Township.

6.     Defendant Jacob C. Stubbs ("Stubbs") is currently, and at all times relevant herein, a member of the Board acting under color of law. He is sued in both his individual capacity and his official capacity as a policymaker for the Township.

7.     Defendant Mark D. Cross ("Cross") is currently, and at all times relevant herein, a member of the Board acting under color of law. He is sued in both his individual capacity and his official capacity as a policymaker for the Township.

8.     DeGroat, Stubbs, and Cross were, at times relevant to this Complaint, duly elected or appointed officials and Trustees of the Board and acted as agents of the Township and its Board. DeGroat, Stubbs, and Cross were, at times relevant to this Complaint, officials who were acting under color of state law and are being sued in their individual and official capacities. They were final decision-makers of the Township and its Board and enacted and implemented customs, practices and/or policies of the Township and its Board.

9.     Defendant Cheryl K. Watson ("Watson") is the former Zoning Inspector for the Township and currently believed to be residing at 8777 Oak Drive, Germantown, Ohio. During times relevant herein, Watson was an employee of the Township and acted under the color of law and at the direction of the Board. She is sued in both her official and individual capacity.

10. Defendant Valorie A. Hill ("Hill") is, upon information and belief, the current Zoning Inspector for the Township. During times relevant herein, Hill was an employee of the Township and acted under the color of law and at the direction of the Board. She is sued in both her individual and official capacities.

## VENUE AND JURISDICTION

11. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, as well as the Fourteenth Amendment of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343. Plaintiff's state law claims for relief are within the supplemental jurisdiction of the Court, pursuant to 28 U.S.C. § 1367.

12. Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because it is the district in which all defendants reside and because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## FACTUAL BACKGROUND

### -- The Harris Property --

13. Neal and Joy Harris have lived at 6707 Little Twin Road for over 20 years. Their property consists of roughly thirteen acres and is zoned for agricultural uses. A portion of Twin Creek is located on the Harris property. Twin Creek runs through the eastern side of the Harris property, with the Harrises owning land on both the eastern and western sides of the creek bank.

14. The Harrises have always enjoyed their use of Twin Creek. Aside from enjoying the serene views of the creek from their property, the Harrises and their children for many years have also enjoyed visiting Twin Creek to spend time together.

15.    Beyond the eastern border of the Harris property is an adjacent property located at 6907 Little Twin Road, Germantown, Ohio.  That property, which is owned by Mark Haffner ("Haffner"), consists of approximately six acres, which is likewise zoned for agricultural uses.

16.    In 2009, the Harrises first observed Haffner living in an old hunting cabin on 6907 Little Twin Road.  At that time, Haffner was converting the hunting cabin to a residential structure.  Upon information and belief, no building permits or other necessary approvals were obtained thereby permitting Haffner to convert the hunting cabin into a residence.  In fact, the cabin, along with its renovations, still exists today as an unpermitted structure.

17.    When Haffner moved onto 6907 Little Twin Road, he sparked controversy with the Harrises.  He would routinely video record and threaten the Harrises and their children as they played and enjoyed time together in and near the creek, even though they remained lawfully on the Harris property.

18.    In 2011, Haffner began to illegally dump rock and other debris into Twin Creek. He first started dumping gravel into the creek, and then bigger items such as bricks and large blocks of broken concrete.  In order to dump these materials into the creek, Haffner had to trespass onto the Harris property.

19.    The materials Haffner dumped destroyed the eastern bank of Twin Creek and would also wash down the creek during periods of heavy rainfall.  Haffner's actions ultimately caused the Harrises to speak with Haffner and address his conduct, which was damaging the Harris property and Twin Creek.  Those discussions would often cause Haffner to lash out, leading to verbal altercations with the Harrises.  At times, the Harrises felt compelled to contact the police as a result of their interactions with Haffner.

**-- Neal and Joy Harris Take Action To Protect Their Property --**

20.     To peacefully curb any further interaction with Haffner and to prevent him from trespassing on their property and illegally dumping materials into Twin Creek, the Harrises felt compelled to erect a barrier between their property and the adjacent Haffner property. The Harrises, therefore, planned to construct an eight (8) foot fence on the eastern boundary line separating their property from the Haffner property.

21.     Before building the fence, the Harrises contacted Township officials to determine the specific regulations they were expected to follow, if any.

22.     At that time, the Harrises were told that since the area where they proposed to erect the fence was in the "front yard" of their property, they were only permitted to build a fence with a maximum height of three-and-a-half (3 ½) feet.  In order to build a fence exceeding this height, the Harrises were told they would need to obtain a variance.

23.     The Township's officials knew the proposed fence would not be constructed on the "front yard" of the Harrises' property, so a variance was not required.  This was later acknowledged by the Township's zoning inspector, Watson, who, on March 20, 2015, wrote to counsel for the Township stating: "the [Harris] fence i[s] really not in their front yard."  Then, in a written report to the Board of Trustees on April 13, 2015, Watson advised that "First, this area is NOT the front yard of the Harris residence."  Finally, in an email to the Township's counsel, Watson stated, "[t]o call this placement the 'front yard' of [the Harrises' property] is less than accurate." The point being, the Township was fully aware the Harrises were not seeking permission to construct a fence in their front yard, and thus they should not have been required to obtain a variance for an eight (8) foot fence.

24. The Harrises complied with the Township's demands. On November 11, 2012, the Harrises filed an application with the German Township Board of Zoning Appeals ("BZA") to build a fence measuring eight (8) feet in height, which was unanimously granted by the BZA on December 11, 2012. (BZA Decision Form, Ex. 1) Seven days later, the Township Zoning Department issued a Zoning Certificate to the Harrises to build their fence. (Zoning Certificate, Ex. 2) Attached to the Zoning Certificate was a hand written diagram of the Harris property identifying the variance area approved for the fence. The Harrises were granted the right to build a fence measuring eight (8) feet high and up to three-hundred-and-sixty-two (362) feet long. (Property Diagram, Ex. 3)

25. The Harrises constructed their fence in Spring 2013. The fence was made out of wood planks and boards which were affixed together by the builders using screws.

26. In late 2013, the Harrises first noticed wood planks from their fence were missing or removed from the fence posts and support beams and had been thrown into the creek. Each time portions of the fence disappeared or were removed, the Harrises repaired those areas.

**-- The Township Initiates Bogus Nuisance Proceedings --**

27. Haffner was enraged by the fence. He routinely spoke with Township officials about forcing the Harrises to remove the fence on the eastern portion of the creek bank.

28. By March 2015, the Township was scheming for a way to rescind the 2012 variance granted to the Harrises. In fact, Watson, who was the acting zoning inspector in 2015, openly stated "I am perplexed that the BZA ever issued the variance…Do they have jurisdiction to revoke that variance?" Watson further asked the Township's counsel, "DO THEY [THE BZA] HAVE THE AUTHORITY TO RE-VISIT THIS VARIANCE; DECIDE THEY HAVE

8

MADE A MISTAKE; ORDER [THE HARRISES] TO REMOVE THE FENCE?…Are we legally bound to do certain things?"

29.     The Township was instructed it could not rescind the variance and was legally bound to follow the law.  Therefore, the Township devised an alternative strategy to illegally force the Harrises to remove their fence.

30.     In April 2015, Watson notified the Harrises their fence constituted a "nuisance" under the Township's zoning resolution and Nuisance Abatement program.  (Nuisance Letter, Ex. 4)  Watson's letter claimed only a portion of the fence was a nuisance due to nails protruding from the wood and because it was unstable due to erosion of the creek bank.

31.     Since the fence was not constructed with nails, the Harrises suspected Haffner was sabotaging their fence and making complaints about it being dangerous.  And the erosion to the creek bank resulted from Haffner's illegal dumping activities a few years earlier.  Nevertheless, Watson's letter instructed the Harrises to either fix those issues or rebuild the portion of the fence the Township considered a nuisance.  The Harrises were threatened that their failure to comply with the demands in Watson's letter may result in the Board taking action to remove the fence.  (Nuisance Letter, Ex. 4)

32.     The Harrises immediately removed the protruding nails from the fence and notified the Township by letter on June 19, 2015.  As for the erosion Haffner caused to Twin Creek, the Harrises could not reinforce the creek bank to prevent further erosion without the involvement and approval of both the U.S. Army Corps of Engineers ("USACE") and the Ohio Environmental Protection Agency ("OEPA").  To do otherwise would have subjected the Harrises to potential penalties for violating the Clean Water Act.  To shore up the creek bank, it

was necessary for the Harrises to first seek and obtain a permit for the necessary work from both regulatory agencies.

33. Despite the Harrises' best efforts to address the Township's nuisance concerns, the matter of their fence went before the Township on several occasions. Each time, the Harrises were forced to appear before the Township Trustees to defend themselves against such baseless attacks. What the Harrises did not know at the time was that no matter the steps they took to placate the Township, those steps would always fall short because the Township embarked on an illegal mission to force the Harrises to tear down their fence.

34. In furtherance of its scheme, the Township adopted Resolution 2015-47 on August 10, 2015, which declared the Harris property a public nuisance under R.C. §505.87. The Township's nuisance finding was once again hitched directly to the Harrises' fence. In particular, the Township declared the fence to be a nuisance primarily because of protruding nails, which it claimed was only partially abated, and because the Township contended sixty (60) feet of fence was improperly supported. The Township gave the Harrises fourteen (14) days to complete the abatement. Notwithstanding its bogus nuisance finding, the Township specifically told the Harrises during an August 10, 2015 hearing that their fence could be re-installed following approval by the USACE; a promise the Township did not intend to honor.

35. The Township knew Resolution 2015-47 was an illegal act that could not be enforced. In fact, the Township was explicitly advised by its legal counsel that R.C. § 505.87 could not be used as a basis to declare the Harrises' fence a nuisance. The Township's legal counsel specifically told the Township and its Board the following:

> As we discussed, RC 505.87 deals with nuisances and Ohio townships. Unfortunately, this is limited to declaring that noxious weeds, trash, refuse, and debris as nuisances. As you can see, the Revised Code is very limited as to what can and cannot be declared a nuisance by the board of Township trustees. In your

case, a fence would not fall under the category of trash or refuse, even if the fence is the ugliest, shoddy list fence ever built…. Moving forward, please be aware that the Resolution used by German Township should be confined to trash and weeds. Of course there are other nuisance remedies for a Township, but none are under RC 505.87.

Because the current resolution uses the wrong section of code, German Township does not have authority to intervene on this matter at this time… However, German Township cannot act under RC 505.87 in this case. The fence is not considered to be weeds or trash. Therefore, German Township cannot take any steps to remove the fence. Also, I am unaware of other Township statutes for zoning code violations that we could use in this case. While I will continue to keep my eyes open, I do not see a solution to this issue for the Board of Township trustees.

36.     The Township knew Resolution 2015-47 was illegal, and kept it secret from the Harrises, who were never advised by the Township that the Resolution was unenforceable or that it should be rescinded. It was clearly a ploy to deceive the Harrises and strong-arm them into removing their fence. In fact, within days of the August 10, 2015 hearing, knowing full well Resolution 2015-17 was illegal and unenforceable, the Township sent a letter to the Harrises telling them that so long as the Board saw progress on abating what the Board had declared a nuisance, the Township would not enforce its August 24 threatened deadline to take action on the Harrises' property. (*See* Jacob Stubbs Letter, Ex. 5) In other words, the Township left the threat of the illegal Resolution hanging over the Harries in its quest to force them to jump through the Township's unlawful hoops.

**-- Growing Animosity From The Township --**

37.     After more than a year and thousands of dollars spent, both the USACE and the OEPA were satisfied with the efforts the Harrises employed to re-establish the eastern bank of Twin Creek destroyed by Haffner.

38.     During that time, Mrs. Harris made a number of public record requests to the Township seeking information concerning the property Haffner was utilizing at 6907 Little Twin

11

Road.  For instance, the Harrises observed Haffner build an in-ground swimming pool on the property that was not secured by a fence, as it should have been.  The Township was favoring Haffner by not enforcing similar regulations against his property, thus treating the Harrises in a disparate and illegal fashion.  And the Township was angered by the Harrises' repeated requests for information that would establish and support such discrimination.

39.     The Harrises' public record requests were not well received by the Township.  On one particular occasion, Watson, who was responsible for responding to certain public records requests on behalf of the Township, expressed her frustration with the Harrises' requests in an email to Stubbs stating:

> Joy Harris has delivered another letter to me …. And, apparently mailed it to all three Trustees as well.  Frankly, I think she thinks I am her personal secretary and I resent it.  The time I am spending on this is beyond ridiculous.  She wants copies of all permits issued back to 1993 for Mr. Haffner's property …."

40.     Watson's email to Stubbs also states:  "**We need to shut her down on this as I am very tired of dealing with her problems while all sorts of new things are happening**."

41.     Additionally, the Township viewed the Harrises' fence as the primary source of frustration between the Harrises and Haffner.  The Township grew tired of dealing with the matter, so in order to end their frustration with the Harrises, the Township continued to scheme to force the Harrises to remove their fence.

### -- Township Illegally Adopts Resolutions<br>Aimed At Forcing the Harrises to Remove their Fence –

42.     By August 2017, the Harrises began re-constructing the portion of the fence illegally characterized by the Township as a nuisance.  The fence was constructed in the same area permitted by the variance granted to the Harrises in 2012.

3264865.6

43.     Once the fence was re-constructed, the Township engaged in another series of unlawful acts aimed at forcing the Harrises to remove their fence.  In particular, the Township passed and adopted a series of unlawful resolutions calling for the removal of the re-constructed fence.

44.     The first strike at the fence occurred during a special meeting of the Trustees on October 3, 2017.  The special meeting was called for the purpose of discussing the Harrises' fence.  The Township's position at that meeting was that the variance issued to the Harrises in 2012 was invalid due to the recently re-constructed creek bank.  Not only did the Township determine the re-constructed portion of the fence had to be removed, but any existing portions of the original fence, as well.  That was contrary to the Township's earlier representations to the Harrises.

45.     In furtherance of its scheme, the Township introduced a Resolution at the October 3, 2017 meeting, ordering the Harrises to remove their fence – Resolution 2017-37.  The Minutes of the special meeting reflect the following:

> It was decided that a resolution should be introduced to order the removal of the fences.  Accordingly Mr. DeGroat introduced RESOLUTION 2017-37, however the exact wording of the resolution could not be determined.  Therefore, the Resolution was tabled and a MOTION was introduced by Mr. DeGroat and seconded by Mr. Stubbs, to request that the Prosecutor's Office draft a RESOLUTION on behalf of the Township.  The Resolution will be discussed and voted once it's available from the Prosecutor.  ALL present voted in favor – MOTION PASSED.

46.     At a subsequent regular meeting of the Board of Trustees on October 10, 2017, DeGroat re-introduced and the Township purportedly passed Resolution 2017-37.  The Minutes of that Meeting state:

> During the Regular Meeting, Benjamin DeGroat re-introduced **RESOLUTION 2017-37** (originally introduced at a Special Meeting held on October 3, 2017) – a **RESOLUTION TO IMMEDIATELY REMOVE THE MOST RECENTLY**

13

**ERECTED FENCE AS IT IS AN UNPERMITTED STRUCTURE. AS WELL AS THE REMAINDER OF THE ORIGINALLY ERECTED FENCE AS IT WAS NOT PROPERLY INSTALLED AND IT DOES NOT FOLLOW THE STANDARDS OF VARIANCES 405.5(D), 405.5(E) AND 405.5(F).** The **RESOLUTION** was seconded by Jacob Stubbs. After discussion, the roll was taken and the adoption was as follows: Mr. Stubbs – YES, Mr. DeGroat – YES, Mr. Cross – YES. **RESOLUTION 2017-37 PASSED.**

47. The Township failed to adopt Resolution 2017-37 in accordance with prevailing law governing the adoption of legislation. A public records request was later made to the Township for a copy of Resolution 2017-37, but it was never provided. It remains unknown what legal basis the Township relied upon to adopt Resolution 2017-37, which ordered the removal of the Harris fence.

48. The Township seemingly recognized it had blatantly and illegally adopted Resolution 2017-37 because it called another special meeting on October 23, 2017, to once again address the "Harris-Haffner fence dispute and to vote on a Resolution to supersede Resolution 2017-37 previously passed." At the October 23 meeting, the Township attempted to adopt a new resolution requiring the Harrises to remove their fence. To this end, the Minutes of that Special Meeting of the Board of Trustees state:

> It was decided that a new resolution should be introduced to order the removal of the fences. Accordingly, Mr. DeGroat introduced RESOLUTION 2017-40 (~~copy attached~~). After the reading and discussion, the roll was called and the vote was as follows:
>
> ~~Mr. Stubbs – YES,    Mr. DeGroat – YES,  Mr. Cross – YES.~~
>
> ~~RESOLUTION PASSED~~
>
> With no further business, a motion was made and seconded to adjourn the meeting. MOTION passed – The meeting adjourned at 4:20 p.m.
>
> **NOTE: after the meeting was adjourned the Board realized that, inadvertently, no one had seconded the Resolution after it was introduced. Therefore, the adoption vote for this meeting was nullified. A follow-up meeting was immediately scheduled for 4:30 pm on October 24, 2017.**

3264865.6

49.     Thus, the Township seemingly recognized it had once more illegally adopted legislation affecting the Harrises and thus, it set yet another special meeting for October 24, 2017 at 4:30 pm.

50.     On information and belief, notice of the special meeting for October 24, 2017, was not proper.

51.     The Township, nevertheless, held the October 24, 2017, special meeting, during which Resolution 2017-40 was re-introduced by DeGroat.  The Minutes of that meeting state:

> The purpose of the Special Meeting was to re-introduce RESOLUTION 2017-40. This RESOLUTION was introduced at the Special Meeting held on October 23, 2017, however, after the meeting was adjourned, the exiting Board members realized that the RESOLUTION had not been seconded prior to the roll being called and the vote taken. Therefore it was deemed necessary to hold another special meeting on this date in order to properly introduce, second and vote on the RESOLUTION.
>
> Mr. DeGroat re-introduced RESOLUTION 2017 – 40 (copy attached).  After the reading and discussion, the roll was called and the vote was as follows:
>
> Mr. Stubbs – YES, Mr. DeGroat – YES, Mr. Cross – YES.
>
> **RESOLUTION PASSED.**

52.     The Minutes of the October 24 Special Meeting do not indicate the re-introduction of Resolution 2017-40 was seconded, as required by law.

53.     Per the text of Resolution 2017-40, the Township asserted it had authority to force the Harrises to remove their fence pursuant R.C. § 505.86. (*See* Resolution 2017-40, Ex. 6) More specifically, the Resolution adopted stated:

> ***
> WHEREAS the German Township Zoning Officer previously inspected the fence pursuant to R.C. § 505.86(B) and determined the fence to be unsafe, not within the standards of the German Township Zoning Regulations, and a nuisance, and;

15

3264865.6

WHEREAS on or about August 10, 2015, the German Township Board of Trustees had previously declared the fence structure a nuisance and directed that it be satisfactorily repaired or removed, and;
***

**THEREFORE, THE GERMAN TOWNSHIP (MONTGOMERY COUNTY) BOARD OF TRSUTEES HEREBY RESOLVES:**

**SECTION 1:** That the fence structures - including the section(s) previously constructed and declared a nuisance in August 2015 - have been declared unsafe and structurally defective under R.C. 505.86 and that they are declared to be in a condition dangerous to life or health, and;

**SECTION 2:** That the newly constructed fence structure is an unpermitted structure that was not installed under the authority of the 2012 variants, and;

**SECTION 3:** in accordance with SECTION 1 and SECTION 2 above, that said fence structures shall be removed 30 days after receipt of notice mailed to the property owner by certified mail. The Township shall contract with an outside party to remove the fence.

**SECTION 4:** Pursuant to R.C. §505.86, the total cost of the removal of the structures shall be paid out of the Township general fund from monies not otherwise appropriated, except that, if the costs incurred exceed $500, the board may borrow money from a financial institution to pay for the costs in whole or in part. The total cost may be collected in either of the following ways: A) Certify the cost to the county auditor will place the cost on the tax duplicate and the costs are a lien upon the lands after the date of entry; or B) The board may commence a civil action to recover the total costs from the owner of the property where the structure is located.
***

The roll was taken in the adoption vote was as follows:

Jacob Stubbs – YES   Benjamin DeGroat – YES      Mark Cross- YES

**RESLUTION 2017-40 passed.**

54.     The Township knew Resolution 2017-40 was illegal, for a variety of reasons.  In particular, R.C. §505.86 specifically states:

 A board of township trustees, by resolution, may provide for the removal, repair, or securance of buildings or other structures in the township that have been declared insecure, unsafe, or structurally defective by any fire department under contract with the township or by the county building department or other authority responsible under Chapter 3781. of the Revised Code for the enforcement of building regulations or the performance of building inspections in the township,

3264865.6

or buildings or other structures that have been declared to be in a condition dangerous to life or health, or unfit for human habitation by the board of health of the general health district of which the township is a part.

*See* R.C. § 505.86(B).

55.     Thus, although the Township stated in Resolution 2017-40 that the "Township Zoning Officer previously inspected the fence pursuant to R.C. § 505.86(B) and determined the fence to be unsafe, not within the standards of the German Township Zoning Regulations, and a nuisance," this was a legal impossibility because the Township Zoning Officer was never vested with authority under R.C. §505.86(B) to declare the fence to be unsafe and a violation of the code.  That is, the Township knew, prior to the adoption of Resolution 2017-40, no member of any fire department, county building code department, or other authority responsible for the enforcement of building regulations in the Township declared the Harrises' fence to be insecure, unsafe or structurally defective, and no qualified health official declared it to be dangerous to life or health.  The Township could not act under R.C. §505.86 absent such specific declaration, but illegally did so anyway.

56.     Further, when it adopted Resolution 2017-40, the Township knew a "fence" did not constitute a "building" or "structure," as those terms are used in R.C. §505.86.  Yet the Township proceeded to illegally declare the fence an unsafe "structure" under the code.

57.     Further still, the Township based Resolution 2017-40 on its assertion the Harrises' fence had previously been declared a "nuisance" in 2015.  When it adopted Resolution 2017-40, the Township knew its Resolution in 2015 declaring the fence a nuisance was illegal and yet the Township perpetuated this illegal conduct by adopting Resolution 2017-40.

58.     On November 10, 2017, the Harrises appealed Resolution 2017-40 and requested a hearing.  Along with their appeal, the Harrises served a public records request on the Township demanding all records related to that specific resolution.  (*See* Notice of Appeal, Ex. 7)

59.     Over the course of the following months, the Harrises made clear to the Township that its adoption of Resolution 2017-40 violated their civil rights and that the Harrises intended to hold the Township accountable.

60.     On June 27, 2018, at a special meeting, the Township adopted Resolution 2018-26, rescinding Resolution 2017-40.  The Harrises were never notified by the Township of the passage of that Resolution.

**-- The Township Continues to Harass the Harrises and Violate Their Civil Rights --**

61.     By late December 2018, the Township had committed several illegal acts.  For example, the Township (i) schemed to rescind the 2012 variance, (ii) illegally declared the Harrises' property a nuisance in 2015 under §505.87, and (iii) twice attempted and eventually adopted Resolution 2017-40 illegally declaring the fence a nuisance under § 505.86.  Although the Harrises continued to fight back, the Township was not done with its illegal actions. Undeterred by its previous unlawful conduct, the Township relentlessly pursued an alternative method aimed at forcing the Harrises to remove their fence.

62.     On December 4, 2018, the Township issued a Notice of Zoning Violation to the Harrises directed at the newly constructed portion of their fence.  According to Hill, the Township's Zoning Inspector at that time, the portion of the Harrises fence constructed in August 2017 was not covered under the 2012 variance and thus, constituted an unpermitted structure that exceeded the maximum height requirement for a front yard fence.  (Notice of Violation, Ex. 8)

3264865.6

63.     Upon information and belief, Hill issued the Notice of Zoning Violation after consulting illegally with DeGroat, Cross, and/or Stubbs in private, non-public in-person and/or telephonic meetings where a majority of the Board was present.

64.     Hill and other Township officials ignored a number of reasons why the Notice of Violation was flatly wrong, including: (i) the 2012 variance had not expired in 2016, (ii) the height of the new fence was 8 feet, in compliance with the 2012 variance, and (iii) the Township had eventually conceded to the Harrises the location of their fence was not in a front yard, and thus a variance was never required.  The Harrises appealed the purported violation and requested a hearing before the BZA.  (Notice of Appeal, Ex. 9)

65.     Although the Harrises were entitled to a hearing within a reasonable time by Ohio law, the Township waited until April 2019, nearly four months after the Harrises' request, to schedule a hearing before the BZA.  The appeal hearing was eventually scheduled on May 14, 2019.  And although the Harrises told the Township it had failed to provide them with a timely hearing, the Township ignored their complaint.  (*See* Letter to Valorie Hill, Ex. 10)

66.     At the conclusion of the hearing, faced with an unassailable evidentiary record, the BZA determined the fence the Harrises constructed in 2016 constituted a "repair", that it was properly erected, and that it did not violate the zoning code.  (BZA Decision, Ex. 11)

67.     The Township was notified of the BZA's decision relating to the Harrises fence at its Regular Meeting on June 10, 2019 and did not alter the findings of the BZA.

68.     Upon information and belief, DeGroat, Cross, and/or Stubbs, comprising a majority of the Board of Trustees, met informally in-person and/or telephonically and outside of a public meeting to discuss the Harrises' fence.

69.     Upon information and belief, DeGroat, Cross, and/or Stubbs, comprising a majority of the Board of Trustees, met informally in person and/or telephonically and outside of a public meeting with Haffner and/or his representatives and other Township residents to discuss the Harrises' fence.

70.     Upon information and belief, DeGroat, Cross, and/or Stubbs, comprising a majority of the Board of Trustees, met informally in person and/or telephonically and outside of a public meeting to discuss action they planned to take against the Harrises.

71.     Upon information and belief, Defendants DeGroat, Cross, and/or Stubbs pre-arranged in private meetings in person and/or telephonically the actions (*e.g.* Resolutions 2015-47, 2017-37, 2017-40, 2018-26 and/or the December 2018 Zoning Violation Notice) they intended to take against the Harrises.

## COUNT I
### (42 U.S.C. § 1983 – Individual Defendants)

72.     Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

73.     Defendants DeGroat, Stubbs, Cross, Watson and Hall, acting under color of law and within the scope of their employment and/or official positions for the Township, engaged in conduct, both jointly and individually, designed and intended to deprive the Harrises of the rights guaranteed to them by the United States and Ohio constitutions.

74.     In particular, these Defendants deliberately misapplied well-established law, as well as the Township's own regulations, in an effort to mislead and misdirect the Harrises into removing a fence that was lawfully erected on their property.

75.     The conduct of these Defendants resulted in the performance and adoption of illegal enforcement actions and resolutions lacking a legitimate legislative purpose in violation of

both the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States and Ohio constitutions.

76.     The Defendants' misconduct was objectively unreasonable and was undertaken intentionally, maliciously and with willful indifference to the Harrises' constitutional rights, including their right to due process and equal protection under the law.

77.     As a direct and proximate cause of the Defendants' actions, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

**COUNT II**
**(42 U.S.C. § 1983 – Municipal Liability; Unlawful Decision by Policymakers)**

78.     Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

79.     The Township, by and through its Board, adopted legislative enactments designed and intended to violate the Harrises constitutional rights.

80.     At all time relevant hereto, DeGroat, Stubbs and Cross were policymakers for the Township, who were each vested with final, unreviewable discretion to make decisions or take action on the Township's behalf.

81.     The Township's conduct, by and through its final policymakers, was objectively unreasonable and undertaken intentionally with deliberate indifference to the Harrises' constitutional rights.

82.     As a direct and proximate cause of the Township's illegal conduct, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

3264865.6

## COUNT III
### (42 U.S.C. § 1983 – Municipal Liability; Unlawful Policy, Practice or Custom)

83. Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

84. The Harrises were the victims of injuries proximately caused by the illegal policies, practices and customs of the Township that not only promoted and permitted the adoption of legislative enactments, but also encouraged Township officials and employees to pursue false enforcement actions, seek out and secure illegitimate zoning violations, and otherwise deny residents equal treatment under the law.

85. Such illegal policies, practices and customs were able to persist and thrive because DeGroat, Stubbs and Cross, as Township policymakers with authority over the Township and its employees, exhibited a deliberate indifference to Township's illegal conduct, as well as the constitutional rights of its residents, thus allowing the same to become well-settled *de facto* policies, practices and customs of the Township.

86. As a direct and proximate cause of the Township's illegal conduct, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

## COUNT III
### (42 U.S.C. § 1983 – Municipal Liability; Ratification)

87. Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

88. DeGroat, Stubbs and Cross, as policymakers for the Township, not only assisted with the unconstitutional conduct committed against the Harrises, but also ratified and approved

3264865.6

decisions made by subordinates, which likewise resulted in violations of the Harrises constitutional rights.

89.     As a direct and proximate cause of the Township's illegal conduct, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

## COUNT IV
### (42 U.S.C. § 1983 – Municipal Liability; Failure to Train & Supervise)

90.     Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

91.     The Township failed to effectively train and supervise its employees in order to prevent vindictive and false enforcement actions and illegitimate zoning violations.

92.     The need for such training was generally known due to the prevalence of such illegal practice(s) but also by the Harrises advising the Township of the egregious conduct of its employees.

93.     The Township's lack of training and supervision constituted a deliberate indifference and manifested in the violation of the Harrises' constitutional rights.

94.     The Township also failed to implement legitimate oversight procedures to prevent its employees from deliberately engaging in illegal conduct designed and intended to injure residents, such as the Harrises.

95.     As a direct and proximate cause of the Township's illegal conduct, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

3264865.6

## COUNT V
### (42 U.S.C. § 1983 – Equal Protection)

96.     Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

97.     Defendants DeGroat, Stubbs, Cross, Watson and Hall, acting under color of law and within the scope of their employment and/or official positions for the Township, engaged in conduct, both jointly and individually, designed and intended to deny the Harrises equal protection of the law in violation of their constitutional rights.

98.     The Harrises were singled out by the Defendants for exercising the rights guaranteed to them under the United States and Ohio constitutions, resulting in purposeful and intentional discrimination.

99.     Upon information and belief, other similarly situated residents of German Township have not been treated in a manner such as the way the Harrises have been treated.  The Harrises are the victims of Defendants selectively enforcing the laws of the State of Ohio and the zoning code of the Township.

100.     The actions of the Defendants were irrational and wholly arbitrary and there was no rational basis for their treatment of the Harrises.  The Defendants' actions were objectively unreasonable and deliberately undertaken with willful indifference to the Harrises constitutional rights.

101.     Defendants' notorious animus towards the Harrises, their extraordinary efforts to force the Harrises to remove their fence, and their purposeful and intentional discrimination violates the Equal Protection Clause of the United States Constitution.

3264865.6

102.    As a direct and proximate cause of the Defendants' actions, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

## COUNT VI
### (Intentional Infliction of Emotional Distress)

103.    Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

104.    Defendants acted intentionally and with malice and likewise engaged in conduct that was extreme and outrageous.

105.    As a result, Defendants caused the Harrises to suffer emotional distress that was severe and disabling.

106.    As a direct and proximate cause of the Defendants' actions, the Harrises' constitutional rights were violated thereby resulting in damages in an amount to be proven at trial.

## COUNT VII
### (*Respondeat Superior* for Common Law and State Constitutional Claims)

107.    Plaintiffs re-allege and reincorporate all of the proceeding allegations as if fully set forth herein.

108.    The Township, by and through its policymakers and employees, violated the rights guaranteed to the Harrises under the common law and constitution of the State of Ohio.

109.    The acts of Defendants were committed within the scope of their employment or official positions for the Township.

110.    The Township is thus liable pursuant to respondeat superior for the common law and state constitutional violations committed by DeGroat, Stubbs, Cross, Watson and Hill.

3264865.6

111.    As a direct and proximate cause of such illegal actions, the Harrises' injured thereby resulting in damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Neal and Joy Harris pray for judgment in their favor and request the following relief from this Court:

A.      An award of compensatory damages against the Defendants in an amount to be determined at trial;

B.      An award of punitive and/or exemplary damages against the Defendants in a fair and just amount to be determined at trial;

C.      An award of all attorney fees and expenses incurred by Plaintiffs Neal and Joy Harris pursuant to 42 U.S.C. 1988 in an amount to be determined at the conclusion of the trial;

D.      Pre-judgment and post-judgment interest;

E.      Any other further relief as the case may require and as the Court may deem just and proper under the circumstances.

Respectfully submitted,

/s/ Toby K. Henderson
Toby K. Henderson  (0071378)
Joshua R. Schierloh  (0078325)
SEBALY SHILLITO + DYER
A Legal Professional Association
1900 Kettering Tower
40 North Main Street
Dayton, Ohio 45423-1013
937.222.2500
937.222.6554 (fax)
thenderson@ssdlaw.com
jschierloh@ssdlaw.com
*Counsel for Plaintiffs Joy and Neal Harris*

3264865.6

## **<u>JURY TRIAL DEMAND</u>**

Plaintiffs Joy and Neal Harris demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b).

<u>/s/ Toby K. Henderson</u>    <br>
Toby K. Henderson
